332 P.3d 144

Eden L. PANADO, Petitioner/Appellant–Appellant,

v.

BOARD OF TRUSTEES, EMPLOYEES' RETIREMENT SYSTEM, State of Hawaii, Respondent/Appellee–Appellee.

No. SCWC–13–0000022.

Supreme Court of Hawai'i.

July 11, 2014.

Philip W. Miyoshi, for petitioner.

Elmira K.L. Tsang and Kyle K. Chang, Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, McKENNA, and POLLACK, JJ., and Circuit Judge CASTAGNETTI, Assigned by Reason of Vacancy.

Opinion of the Court by
RECKTENWALD, C.J.

The instant case arises from Eden Panado's application for service-connected disability retirement with the Board of Trustees of the Employees' Retirement System of the State of Hawai'i. In her application, Panado alleged that she was permanently incapacitated because of neck and back injuries she sustained while lifting boxes during an October 8–9, 2004 work shift for the City & County of Honolulu's Department of Information Technology. The statute at issue in this case, Hawai'i Revised Statutes (HRS) § 88–79, allows for service-connected disability retirement benefits if a member of the ERS can show that he or she was "permanently incapacitated for duty as the natural

and proximate result of an accident occurring while in the actual performance of duty at some definite time and place. . . ."

The Board of Trustees denied Panado's application. Although the parties stipulated that Panado had suffered an injury sometime during her October 8–9, 2004 work shift, and that she was permanently incapacitated for work by the time of her application, the Board of Trustees determined that (1) Panado's October 8–9, 2004 injury was not an "accident" under HRS § 88–79 because she had failed to show that the injury occurred at "some definite time and place"; and (2) Panado's permanent incapacity was not the "natural and proximate result" of the October 8–9, 2004 incident.

Panado appealed to the Circuit Court of the First Circuit (circuit court), which affirmed the Board of Trustees' decision because Panado had failed to show that the incident occurred at "some definite time and place." The circuit court did not address the other reason for the Board of Trustees' denial of Panado's application, i.e., that she failed to prove her incapacity was the natural and proximate result of the alleged accident. A majority of the Intermediate Court of Appeals (ICA) affirmed the decision.

In her Application for Writ of Certiorari, Panado asserts that: (1) the ICA erred in affirming the circuit court's conclusion that Panado's injuries during a single eight-hour work shift did not occur at a "definite time and place" under HRS § 88–79 [1] and Ha-

wai'i Administrative Rule (HAR) § 6–22–8,[2] and (2) the evidence in this case demonstrates a causal connection between the October 8–9, 2004 incident and her permanent incapacity.

We agree with Panado that the "definite time and place" language in HRS § 88–79 does not preclude the recovery of benefits despite her inability to pinpoint the precise moment of injury when, as in the instant case, there is no dispute that Panado was injured during her work shift. However, we remand the case to the circuit court for it to determine the Board of Trustees' second ground for denying Panado's application, namely, that her permanent incapacity is not "the natural and proximate result of the alleged incident."

## I. Background

### A. Factual Background

The following factual background is taken from the record on appeal.

On October 8–9, 2004, Panado was working as a Computer Operator III with the City & County of Honolulu (City & County) Department of Information Technology. During her work shift, which ran from 11:30 p.m. on October 8 to 7:45 a.m. on October 9, 2004, she was assigned to print voter registration forms and had to lift 10–15 boxes of paper. The following day, on October 10, 2004, Panado was admitted to the emergency room at Tripler Hospital for treatment of neck and

1. HRS § 88–79(a) (Supp.2007) provides in relevant part that:

Upon application of a member, or the person appointed by the family court as guardian of an incapacitated member, any member who has been permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, or as the cumulative result of some occupational hazard, through no wilful negligence on the member's part, may be retired by the board for service-connected disability[.]

2. HAR § 6–22–8 (effective 2009–2014) provides that:

Upon completion of the examination of the member and the reports submitted to it, the medical board shall certify in writing to the board the following:

(1) In the case of an application for ordinary disability or service-connected disability retirement, whether or not the incapacity is:
(A) For the further performance of duty; or
(B) For gainful employment; and
(C) Likely to be permanent.
(2) In the case of an application for service-connected disability retirement or for accidental death benefits, whether or not the incapacity or death is:
(A) The natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place; or
(B) The cumulative result of some occupational hazard (in the case of service-connected disability retirement) or the result of some occupational hazard (in the case of accidental death benefits); and
(C) Through no wilful negligence on the part of the member.

low back pain. From October 9, 2004 to October 5, 2005, Panado was unable to return to work.

On October 12, 2004, Panado applied for workers' compensation and began to receive temporary total disability benefits from the City & County. As a result, the City & County required Panado to undergo several independent medical evaluations (IME). Deborah Agles, M.D., performed an IME of Panado on January 11, 2005, diagnosing her with lumbosacral and cervical strains. Dr. Agles noted that, "[a]t present time, I believe that the patient is unable to work, and should continue on temporary total disability benefits." Explaining that Panado's "prognosis is guarded because of the diffuse nature of pain symptoms, ... hyperreflexia[,] [3]" and "subjective symptoms which are not completely concordant with objective studies," Dr. Agles noted, however, that Panado "presented in an honest and reliable manner; there were no overt pain behaviors, and no evidence of malingering or secondary gain.[4]"

Dr. Agles submitted a supplemental report on June 14, 2005, after reviewing Panado's medical records. Dr. Agles opined that:

the patient's current symptoms are not completely attributable to the incident of 10/09/04. The 10/09/04 accident may have caused an exacerbation of her low back condition, but her low back was already symptomatic and receiving active medical care in close proximity to the subject injury (four days prior). The medical records do not support a pre-existing cervical spine condition, although x-rays were obtained of the neck in 1989, and there was a motor vehicle accident in 1994, with intermittent symptoms in the bilateral upper extremities.

Dr. Agles further opined that "the incident of 10/09/04 did cause an injury to the cervical spine" and that "[t]he low back can be considered at pre-injury state[.]" Dr. Agles noted that Panado's records indicated she had longstanding fibromyalgia, and that the "pain [Panado] experiences from fibromyalgia is complicating her presentation; this diagnosis is important, and was not discussed by the patient when a past medical history was obtained."

Panado returned to work on October 6, 2005. She was assigned to light duty and not permitted to carry anything heavy.

On October 24, 2005, another IME was performed by Donald K. Maruyama, M.D. Based on his examination of Panado and review of her records, including Dr. Agles' report, Dr. Maruyama stated that:

Dr. Agles felt that [Panado] had reached her preinjury status with regard to her lower back and lower extremity symptoms and her opinion was that her ongoing symptomatology in her low back and lower extremities was due to a pre-existing condition. I generally tend to agree although there may be at least mild permanent aggravation of her ongoing low back and right lower extremity symptomatology, at least from the subjective standpoint. Her cervical and right upper extremity symptoms appear to be a direct result of the October 9, 2004 incident although her chronic fibromyalgia situation does contribute to her overall musculoskeletal symptoms.

Dr. Maruyama also stated that "Panado has returned to her usual and customary duties of Computer Operator III at the City & County. A review of the position description reveals that she can probably perform all of the duties as described."

Panado was again off of work from January 26, 2006 to March 5, 2006. On March 30, 2006, Panado was medically disqualified from work by her primary treating physician, Diokson Rena, M.D., because she was "unable to perform and tolerate [her work] duty despite restrictions."

3. "Hyperreflexia" is defined as "exaggeration of the reflexes." *The Sloane–Dorland Annotated Medical–Legal Dictionary* 355 (1987).

4. "Secondary gain" is defined as "a secondary psychic or social advantage derived from a symptom or illness[,]" such as when a physical illness "might result in a pension for [an] individual[.]" *The Sloane–Dorland Annotated Medical–Legal Dictionary* 305.

### B. Proceedings relating to Panado's eligibility for benefits

On May 1, 2006, Panado filed an Application for Disability Retirement with the ERS. In her application, she stated that on October 9, 2004, as a "Computer Operator III, Department of Information Technology, Operations Division," she was "printing voters' registration forms on 2 impact printers and while lifting forms to load & unload between printers, felt pain in lower back, upper back, shoulder, neck, & right arm. Next day was more intense pain & barely able to move the following day."

On July 12, 2007, Dr. Lichter, a former chair of the ERS Medical Board, performed a medical records review for ERS. Among the records reviewed were the independent medical examinations by Dr. Agles and Dr. Maruyama, reports by her treating physician Dr. Rena, and Panado's military medical records. Dr. Lichter's report stated:

> I strongly disagree with Dr. Maruyama's [October 24, 2005] opinion that "there may be at least a mild permanent aggravation of her ongoing low back and right lower extremity symptomatology ..." His opinion is based only, as he stated, on a "subjective standpoint." This latter opinion indicates that [Pando's] self-serving reports are the primary basis of his opinion which is essentially contrary to the objective evidence.
>
> The omission by [Panado] of any reference to her preexisting, properly diagnosed and repeatedly treated illness leads the undersigned to believe that there is a strong chance that [Panado's] claim is not only worthless but may be fraudulent.

Although Dr. Lichter already expressed an opinion, and notably a very negative one, the Board of Trustees selected him to perform another IME on Panado, which he did on October 24, 2007. In his accompanying report, Dr. Lichter concluded that Panado's incapacitation stemmed from "non-organic" causes and not from the injuries she suffered from lifting the boxes. During the physical examination of Panado, Dr. Lichter recognized the presence of several Waddell signs, which are a group of inappropriate responses to physical examination that indicate non-organic or psychological causes of pain.[5] Performing a test for "distraction," in which a straight leg raise is performed while the patient is lying flat, then, while distracting the patient, another straight leg raise is done while the patient is seated, Dr. Lichter reported that Panado showed a marked difference in pain response to the two leg raises even though the pain response should be consistent. Dr. Lichter also observed the presence of other Waddell signs such as "over-reaction," "regional disturbances," and simulation. Dr. Lichter noted that "[t]wo or more of these findings strongly suggest a psychological basis for some or all of [Panado's] complaints."

Based on these tests and a review of Panado's medical records, Dr. Lichter diagnosed Panado as having (1) "Chronic neck and back pain due to herniated nucleus pulposes at C 4–5 and L5–S1, probably secondary to a motor vehicle accident in 1994"; and (2) "Failure to cope with situational stress and mild permanent residuals of # 1." Dr. Lichter also reiterated that Panado's failure to mention her preexisting fibromyalgia led him to believe that her claim may be fraudulent.

On November 12, 2007, the Medical Board issued its report, which summarized the facts and pertinent medical records regarding Panado, then stated its findings:

> The findings of the undersigned [Medical] Board are that [Panado] is permanently incapacitated for the further performance of duty, but that such incapacity is not the natural and proximate result [6] of an accident that occurred while in the actual performance of duty at a specific place and time, and not the cumulative result of an occupational hazard as explained above.

Based on these findings, the Medical Board recommended that Panado be denied service-connected disability retirement.

---

5. *See* Gordon Waddell et al., *Nonorganic Physical Signs in Low–Back Pain,* Spine March/April 1980, at 117–25.

6. HAR § 6–22–2 (effective 1984–2014) defines "Natural and proximate result" as "the result that would naturally follow from the accident, unbroken by any independent cause."

**6**

Panado appealed the decision of the Medical Board to the Board of Trustees. At the January 19, 2010 hearing on her appeal, the parties stipulated to Panado being "physically or mentally incapacitated with [regard to the] further performance of duty as a Computer Operator III"; that "such incapacitation is likely to be permanent"; and that "such incapacitation is not the result of willful negligence on the part of Ms. Panado." The parties also stipulated that "on the date of the injury on October 9, 2004, that [Panado was] working in [her] job as the Computer [Operator III]."

Patricia L. Chinn, M.D., Medical Board Chairperson, appeared for the Medical Board as an expert witness in medicine and general surgery and testified that, in the Medical Board's view, "accident" under HRS § 88–79 "needs to occur at a specific date and time. It's not over a stretch of hours. It is not something that occurs and then developed symptoms the following day." Dr. Chinn further explained:

A: [The] ERS definition of accident is pretty clear. It's got to occur at a specific date and time and in general, there's an immediate complaint of pain or disability. When somebody develops pain the following morning, that for most physicians is related to an overuse, muscle over use or a strain, muscle strain, which generally is self resolving.

Q: What about gradual onset of pain while you're performing an activity?

A: That doesn't follow the definition of an accident. Generally it's like immediate. I don't think you can record snapping my fingers, but it's an immediate occurrence and you are aware that something happened at that time. And you can, you know, as you—I mean if I were to get up and I were to lift multiple boxes and I have neck problems and I have a disk, and I've had problems with my neck and my back, I could move multiple boxes and I might gradually develop discomfort as my muscles tensed.

And maybe I'm a little bit out of joint and maybe because I'm a little deconditioned, but the fact that I might develop pain over a period of time with an associated activity does not constitute an accident. That's clearly against the definition of accident for the Medical Board purposes.

The Hearing Officer issued her Recommended Decision on June 29, 2010, including the following Findings of Fact:

3. Petitioner described the October 9, 2004 alleged accident in her Application as "[p]rinting voters' registration forms on 2 impact printers and while lifting forms to load & unload between printers, felt pain in lower back, upper back, shoulder, neck & right arm. Next day was more intense pain & barely able to move the following day."

. . .

12. Petitioner had fibromyalgia during all relevant times in this case.

13. The October 9, 2004 incident did cause injury to Petitioner's cervical spine.

14. Petitioner sustained a temporary aggravation of her lower back condition on October 9, 2004, but was back at pre-injury state by the October 24, 2005 date of Dr. Maruyama's IME.

15. Notwithstanding Petitioner's cervical and low back problems, Petitioner had returned to work and was able to perform all of the duties of her full-time job by the October 24, 2005 date of Dr. Maruyama's IME.

16. Dr. Maruyama's opinion that "there may be at least a mild permanent aggravation of Petitioner's low back and right lower extremity symptomatology" was based only on a subjective standpoint (i.e., Petitioner's self-serving reports) and is contrary to the objective evidence.

. . .

20. Petitioner is permanently incapacitated for the further performance of duty as a Computer Operator III.

21. The October 9, 2004 incident does not constitute an accident for purposes of disability retirement under Chapter 88, HRS.

22. Petitioner's permanent incapacity is not the natural and proximate result of the alleged accident.

The Hearing Officer also proposed the following Conclusions of Law:

2. Petitioner has failed to prove by a preponderance of the evidence that her incapacity for further performance of duty was (a) the natural and proximate result of an accident which occurred October 9, 2004 or (b) the cumulative result of an occupational hazard, as required by HRS § 88–285 and § 88–79.

3. Petitioner is not entitled to service-connected disability retirement.

Based on the above findings and conclusions, the Hearing Officer recommended that the Board of Trustees deny service-connected disability retirement benefits to Panado. On September 20, 2010, the Board of Trustees issued a Proposed Decision that adopted the Hearing Officer's Recommended Decision, including the Hearing Officer's findings of fact and conclusions of law. The Board of Trustees' December 16, 2011 Final Decision affirmed its Proposed Decision and also adopted the Hearing Officer's Recommended Decision, findings of fact, and conclusions of law. Accordingly, the Board of Trustees denied Panado's application for service-connected disability retirement benefits.

On January 17, 2012, Panado timely appealed the Final Decision to the circuit court. In her opening brief before the circuit court, Panado challenged the Board of Trustees' determination that (1) the October 8–9, 2004 incident was not an "accident" and (2) the incapacity was not the natural and proximate result of the October 8–9 incident. Panado argued that the facts of the instant case are "virtually identical" to *Myers v. Board of Trustees of Employees' Retirement System*, 68 Haw. 94, 95, 704 P.2d 902, 903 (1985).[7] Thus, because the incident in *Myers* was determined to be an accident, the incident in the instant case should also be an accident. Panado next argued that the medical opinions by Dr. Rena, Dr. Maruyama, and Dr. Agles established "a causal connection between the October 9, 2004 accident and [Panado's] incapacity."

In its answering brief, the Board of Trustees argued that "[w]hether Ms. Panado was entitled to disability retirement ... is a mixed question of fact and law" subject to review under the clearly erroneous standard, and not, as Panado contended, a question of law. The Board of Trustees also argued that the clearly erroneous standard of review applied because the Board disputed whether Panado's incapacity was the natural and proximate result of the accident, and whether Panado's "permanent incapacity was due to the natural worsening of her significant preexisting low back problems," rather than any accident on October 8–9, 2004. The Board of Trustees explained that Panado's case was distinguishable from *Myers* because *Myers* "could point to a definite time and place when the accident occurred." (Emphasis in the original).

The Board of Trustees next contended that, "even if this Court found the events of October 9th met the definition of accident

---

7. In *Myers*, a state employee was lifting an approximately thirty-five pound coffee maker to prepare to conduct a training class when he heard a snap in his back. 68 Haw. at 95, 704 P.2d at 903. He experienced sharp pains across his lower back and buttocks and eventually became disabled. *Id.* The Board of Trustees rejected his application for service-connected total disability retirement. *Id.* at 95, 704 P.2d at 904. The circuit court reversed the Board of Trustees' decision and order. *Id.* In its appeal to this court, the Board of Trustees argued that Myers' incident was not an "accident" within the meaning of HRS § 88–77, and the Board of Trustees was not clearly erroneous in deciding that Meyers' incapacitation was not the natural and proximate result of the coffee maker incident. *Id.* at 95–96, 704 P.2d at 904.

Because the facts were not in dispute, this court stated that whether or not the incident was an "accident" was a question of law. *Id.* at 96, 704 P.2d at 904. The *Myers* court then defined "accident" as "an unlooked for mishap or untoward event which is not expected or designed," *id.* (quoting *Lopez v. Bd. of Trs. of ERS*, 66 Haw. 127, 130, 657 P.2d 1040, 1043 (1983)), and concluded that "[s]ince the ... incident was, beyond question, an unlooked for mishap which was not expected or designed, it was an 'accident[,]'" *Myers*, 68 Haw. at 96, 704 P.2d at 904.

On the second issue, whether the accident was the proximate cause of Myers' incapacitation, this court stated that the "question of causal connection is ... basically a matter of medical opinion." *Id.* at 97, 704 P.2d at 905. Based upon its review of the record, including the opinions of various doctors, this court concluded that the Board of Trustees clearly erred in finding "no causal connection." *Id.* Accordingly, the *Myers* court affirmed the circuit court's order.

under HRS § 88–79, Ms. Panado would not be entitled to receive service-connected disability retirement benefits since her incapacity was not the 'natural and proximate result' of the events of October 9th." The Board of Trustees explained that it had found her permanent injuries were not caused by the events of October 9th, but rather by preexisting degenerative medical conditions and injuries.

In her reply brief, Panado argued that the issue was a question of law because there was no dispute between her and the Board of Trustees that she was injured while working her shift. The only question for the circuit court was whether the events that occurred constitute an "accident." Panado contended that the Board of Trustees read the phrase "definite time and place" too narrowly in requiring her to "establish the exact moment" she was injured. (Emphasis in the original). Panado also argued that the medical opinions of Dr. Agles, Dr. Maruyama, and Dr. Rena all show that the October 8–9 accident proximately caused Panado's incapacity.

On September 14, 2012, the circuit court held a hearing on Panado's appeal. Panado's counsel stated, "we concede essentially that we can't probably pinpoint to the exact box that she picked up [at which time the accident] may have occurred"; however, because the parties agreed that Panado suffered an injury during her work shift, the issue upon which the case hinged was a question of law, namely, whether HRS § 88–79 required a showing of the precise moment and place of injury to constitute an "accident" or whether it was enough to show, as Panado did, that she was injured during her work shift. The court stated:

So let's say assuming arguendo that it was around an eight-hour shift. And during the course of her shift, her job required her to either lift, push, pull, that type of activity with respect to these boxes. So during a period of time.

Now, whether or not this type of activity over a course of an eight-hour shift constitutes an accident at some definite time and place, the Court will say that given its plain ordinary meaning, the answer is no. And we only have the [Myers] case. But even the [Myers] case did not look at the accident definition, injecting at some definite time and place.

The Court will interpret the definition as definite time and place which these facts do not apply. So it's a conclusion.

And in terms of mixed question of fact and law, I don't think the facts are disputed as to what she was doing during the eight-hour period of time. What was in dispute was the description to the various doctors. But that—the Court is going to set that aside for its analysis.

So even assuming all of that took place, whether it's one box, two boxes, several boxes, hour one, hour two, over the course of eight hours, the facts—the facts and—do not constitute an accident at some definite time and place with the emphasis on that.

So the—affirmed. And the appeal is being dismissed.

On November 9, 2012, the circuit court issued its decision and order affirming the Board of Trustees' final decision. The circuit court determined:

5. [Panado] described the "accident" as "repetitively lifting & moving heavy boxes" during the course of her shift; however, [Panado] did not establish a specific time or event during the course of [Panado's] eight-hour shift when her claimed "accident" occurred.

. . .

7. Given the plain and ordinary meaning of "at some definite time and place" in HRS § 88–79 and HAR 6–22–4, the Court concludes that repetitive lifting and moving of heavy boxes during the course of [Panado's] eight hour shift does not constitute an "accident" for purposes of determining whether [Panado] is entitled to service connected disability retirement benefits under HRS §§ 88–285 and 88–79.

8. The Court finds that [the Board of Trustees] did not commit any error in law or fact in its determination that [Panado's] incapacity is not the result of an accident that occurred on October 9, 2004.

Based on these determinations, the circuit court affirmed the Final Decision of the Board of Trustees. The circuit court entered final judgment on December 13, 2012. Panado timely appealed.

## C. ICA Appeal

In her opening brief, Panado reiterated that the October 8–9, 2004 incident was virtually identical to the facts under *Myers,* in which this court held that Myers' incapacity from lifting the coffee maker was a compensable injury. Panado next argued that the circuit court "erred in too narrowly construing 'definite time and place' " to preclude her claim because she could not point to her exact moment of injury.[8] Panado again relied on *Myers,* observing that nothing in *Myers* required Panado to "demonstrate her injury with such precision."

In its answering brief, the Board of Trustees contended that the ICA should apply a more deferential, clearly erroneous standard of review to the issue on appeal because it was a mixed question of law and fact rather than a question of law. Specifically, the Board of Trustees characterized the issue as a mixed question of law and fact because the "legal conclusion that [Panado's] alleged October [8–]9 2004 incident occurred at a 'definite time and place' is dependent upon the particular facts and circumstances surrounding her alleged injuries." The Board of Trustees also argued that the ICA should give proper deference to its interpretation of HRS § 88–79 because it is the agency charged with administering the statute. The Board of Trustees then maintained that *Myers* was distinguishable from the instant case because Myers could point to a specific time of injury, and thus would satisfy the Board's interpretation of HRS § 88–79's "definite time and place" as requiring proof of the exact moment of injury.

In her reply brief, Panado argued that the proper standard of review is de novo because the determinative issue was how to interpret HRS § 88–79's "definite time and place" language. According to Panado, the parties agreed on the events at issue, namely, that Panado was injured while working her shift on October 8–9, 2004. However, the issue the parties did not agree on, and that the ICA must decide on appeal, is whether the events at issue constitute an "accident" that occurred at some "definite time and place" under HRS § 88–79.

On November 26, 2013, a majority of the ICA issued an SDO that affirmed the circuit court's November 9, 2012 decision and order. The majority held that (1) the instant case was distinguishable from *Myers* and that (2) the circuit court's construal of "a definite time and place" was not clearly erroneous. Specifically, the majority concluded that *Myers* was distinguishable because the facts in *Myers* were undisputed, whereas in Panado's case, there was a dispute about whether her injury arose over the course of her eight-hour shift or at a particular moment,[9] and whether the injury was a permanent or temporary aggravation of preexisting injuries. The majority emphasized that the facts in the instant case were disputed, and rejected Panado's contention that the material facts, i.e., that the alleged accident occurred at her workplace during her eight-hour work shift, were undisputed. Accordingly, the majority rejected Panado's argument that it should apply a de novo standard of review.

The majority instead concluded that the issue under review was more accurately characterized as a mixed question of law and fact regarding "whether the circuit court erred by narrowly construing the phrase 'a definite time [and] place' as used in HRS § 88–79(a) and HAR § 6–22–2 to exclude the 'repetitive lifting and moving of heavy boxes during the course of [Panado's eight-hour] shift[.]' " (Citing *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)) (brackets in the original). Based on this conclusion, the majority applied a clearly er-

---

**8.** Consistent with her counsel's concession in oral argument in the circuit court, Panado argued that she injured herself while lifting "approximately 10–15 heavy boxes of Xerox paper," rather than suggesting that she was injured while lifting or dropping a particular box.

**9.** However, as noted, *supra* note 8, Panado abandoned her argument that she was injured when she dropped a particular box.

roneous standard to the circuit court's decision and held that, "the circuit court's construal of 'a definite time and place' was not clearly erroneous." Accordingly, the ICA affirmed the circuit court's December 13, 2012 final judgment.

In a dissenting opinion, Chief Judge Nakamura stated that the circuit court erred, as a matter of law, in ruling that "Panado's description of how she was injured was insufficient to satisfy the requirement of HRS § 88–79 that the work accident occur 'at some definite time and place.'" According to Chief Judge Nakamura, the standard of review should be de novo because the case turned on a question of statutory interpretation, more specifically, the meaning of "at some definite time and place." Chief Judge Nakamura concluded that the legislative intent for the "at some definite time and place" language was to limit qualifying accidents to those that are clearly work related. Noting that it was undisputed that Panado injured herself as a result of lifting boxes during her October 9, 2004 work shift, Chief Judge Nakamura then concluded that "Panado's inability to specifically attribute her injuries to a particular box lifted or pinpoint the exact time during the eight-hour shift that she sustained injuries did not detract from the fact that she clearly suffered injuries as the result of a work-related accident." Thus, Panado's description of her injuries was sufficient to meet the "at some definite time and place" requirement. For these reasons, Chief Judge Nakamura would have vacated the circuit court's decision and order and remanded the case to the circuit court to rule on the Board of Trustees' alternative ground for denying Panado's application, i.e., that she failed to demonstrate that her incapacitation was the natural and proximate result of the October 9, 2004 incident.

The ICA filed its judgment on January 3, 2014. On March 4, 2014, Panado timely filed the instant application for a writ of certiorari. The Board of Trustees filed a response on March 19, 2014.

## II. Standards of Review

### A. Review of agency decisions

 Review of a decision made by the circuit court upon its review of an adminis-

trative decision is a secondary appeal. *Ahn v. Liberty Mut. Fire Ins. Co.,* 126 Hawai'i 1, 9, 265 P.3d 470, 478 (2011) (citation omitted). The circuit court's decision is reviewed de novo. *Id.* The agency's decision is reviewed under the standards set forth in HRS § 91–14(g). *Id.* HRS § 91–14(g) (1993) provides:

"(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." *Sierra Club v. Office of Planning,* 109 Hawai'i 411, 414, 126 P.3d 1098, 1101 (2006) (citation, internal quotation marks and brackets omitted).

*Liberty Dialysis–Hawaii, LLC v. Rainbow Dialysis, LLC,* 130 Hawai'i 95, 102–03, 306 P.3d 140, 147–48 (2013).

### B. Statutory interpretation

 "'Statutory interpretation is a question of law reviewable de novo.'" Our construction of statutes is guided by the following rules:

First, the fundamental starting point for statutory-interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

*First Ins. Co. of Hawaii v. A & B Props.,* 126 Hawai'i 406, 414, 271 P.3d 1165, 1173 (2012) (citations omitted) (quoting *State v. Wheeler,* 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009)).

## C. Interpretation of agency rules

General principles of statutory construction apply in interpreting administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning. While an agency's interpretation of its own rules is generally entitled to deference, this court does not defer to agency interpretations that are plainly erroneous or inconsistent with the underlying legislative purpose.

*Liberty Dialysis–Hawaii,* 130 Hawai'i at 103, 306 P.3d at 148 (internal quotation marks and citations omitted).

## III. Discussion

Under HRS § 88–79, a member of the ERS may qualify for service-connected disability retirement benefits if that member has been:

permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty <u>at some definite time and place,</u> or as the cumulative result of some occupa-

tional hazard, through no wilful negligence on the member's part[.]

(Emphasis added); *see also* HAR § 6–22–8.

This court has defined "accident" as "an unlooked for mishap or untoward event which is not expected or designed." *Lopez v. Bd. of Trs., Employees' Ret. Sys., State of Hawaii,* 66 Haw. 127, 130–31, 657 P.2d 1040, 1043 (1983). Notably, unlike workers' compensation claims, there is no presumption of compensability for disability retirement benefits claims. The party initiating the ERS proceeding "shall have the burden of proof, including the burden of producing evidence and the burden of persuasion. . . . The degree or quantum of proof shall be a preponderance of the evidence." HAR § 6–23–31 (effective 2009–2014).

Panado argues that (1) the "circuit court erred in too narrowly construing 'definite time and place' " under HRS § 88–79 when it "concluded that the injuries [Panado] suffered while lifting boxes during her October 8–9, 2004 shift did not constitute an 'accident' because [she] essentially could not point to the exact moment during such shift that she was injured"; and (2) her October 8–9, 2004 incident is an accident under *Myers* because her case is factually analogous to Myers'. She also argues that the "evidence in this case . . . demonstrates a causal connection between the October 8–9, 2004 incident and her incapacity."

## A. The ICA should have applied a de novo standard to the issue under review, namely, whether the statutory language of "definite time and place" requires a claimant to show the exact moment when an injury occurs

The ICA majority and dissent disagreed regarding (1) whether the issue under review was a question of law or a mixed question of fact; and (2) the standard of review to be applied to the circuit court's decision. Accordingly, this court will first address these issues.

The ICA majority concluded the issue under review was a mixed question of law and fact regarding "whether the circuit court erred by narrowly construing the phrase 'a

definite time [and] place' as used in HRS § 88–79(a) and HAR § 6–22–2 to exclude the 'repetitive lifting and moving of heavy boxes during the course of [Panado's eight-hour] shift[.]' " (Citing *Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)) (brackets in the original). Based on this conclusion, the ICA applied a clearly erroneous standard to the circuit court's decision and held that, "the circuit court's construal of 'a definite time and place' was not clearly erroneous."

The ICA dissent, on the other hand, would have applied a de novo standard of review since, in its view, the interpretation of "at some definite time and place" was a question of law.

■■■■ The ICA majority erred in reviewing the circuit court's decision under a clearly erroneous standard. "Review of a decision made by the circuit court upon its review of an administrative decision is a secondary appeal. The circuit court's decision is reviewed de novo. The agency's decision is reviewed under the standards set forth in HRS § 91–14(g)." *Liberty Dialysis–Hawaii*, 130 Hawai'i at 102, 306 P.3d at 147 (citations omitted). As the circuit court was acting as an appellate court to the Board of Trustees' decision, the ICA could only apply the HRS § 91–14(g) standards to the Board of Trustees' decision in order to determine de novo whether the circuit court's decision was incorrect.[10] Instead, the ICA incorrectly applied a clearly erroneous standard to the circuit court's decision.

■■■■ In addition, the ICA mischaracterized the Board of Trustee's determination upon which this case turns as a mixed question of law and fact, to be reviewed under a clearly erroneous standard, rather than a question of law, reviewable under a de novo standard.[11] As a result, the ICA rejected Panado's contention that the ICA "should apply a de novo standard of review to the undisputed fact that the alleged accident occurred at her workplace during her eight-hour work shift."

However, Panado was correct. The issue upon which this case turns is a question of law, namely, whether the Board of Trustees correctly construed HRS § 88–79's language of "some definite time and place." More precisely, because the parties agreed that Panado was injured during her work shift but that she cannot point to a specific moment of injury, the case turns upon whether the statutory language of "some definite time and place" should be construed broadly to encompass an entire eight-hour work period, or narrowly to require that the claimant pinpoint the exact moment when an injury occurs. If "some definite time and place" requires proving the precise moment of injury, then Panado's claim fails as a matter of law, whereas if "some definite time and place" is construed broadly to simply require proof an injury occurred during a specific period of work, then Panado's claim survives with respect to this issue.

Accordingly, the ICA erred in concluding that the circuit court's decision should be reviewed under a clearly erroneous standard and in characterizing the determinative issue

---

**10.** Indeed, the circuit court noted that it was not making a mixed determination of law and fact, pointing out that "[t]his is a very narrow issue regarding the definition of 'accident[,]' " and concluding as a matter of law that Panado's description of the October 8–9, 2004 incident did not satisfy HRS § 88–79's requirement that the accident occur at "some definite time and place[,]"

**11.** The ICA appears to have drawn its understanding of mixed question of law and fact from the Board of Trustees, which argued in its reply brief that:

> [Panado] has submitted that the only issue presented on appeal is a question of law, specifically, whether her alleged October 9, 2004 incident occurred at a "definite time and

place" for purposes of qualifying for service-connected disability retirement benefits. However, [Panado] is wrong, as this case involves mixed questions of fact and law. Only if facts are undisputed may a presented question be decided as a matter of law.

(Citations omitted).

This misapprehends the concept of mixed question of law and fact, which is simply an issue that must be determined by applying the law to the facts of a case. *See Price v. Zoning Bd. of Appeals of City & Cnty. of Honolulu*, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994) (defining a mixed question of law and fact as a "conclusion [that] is dependent upon the facts and circumstances of the particular case").

as a mixed question of law and fact. Because the determinative issue here is whether the statutory language of "definite time and place" requires a claimant to show the exact moment when an injury occurs, the appropriate standard of review is de novo.

 Reviewing HRS § 88–79 de novo, the statutory provision does not require a claimant to establish the exact moment of injury in order to recover service-connected disability retirement benefits. Based on the plain language and legislative history of HRS § 88–79, Panado satisfied the provision's requirement of showing that an accident occurred "while in the actual performance of duty at some definite time and place" by establishing that she was injured during her October 8–9, 2004 work shift.

"[T]he fundamental starting point for statutory interpretation is the language of the statute itself." *First Ins.*, 126 Hawai'i at 415, 271 P.3d at 1174 (quoting *Wheeler*, 121 Hawai'i at 390, 219 P.3d at 1177). "[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *Id.* The Board of Trustees maintains that the word "definite" in "definite place and time" requires a showing of the "specific time and place" at which her injury occurred.

Contrary to the Board of Trustees' contention, however, the standard definition of "definite" does not require "definite time and place" to mean the exact moment of injury. *See Olelo: The Corp. for Cmty. Television v. Office of Info. Practices*, 116 Hawai'i 337, 349, 173 P.3d 484, 496 (2007) (concluding that in the absence of a legislative definition of a term, courts can look to legal and lay dictionaries for guidance as to the term's meaning). "Definite" is commonly defined as, "clearly stated or decided; not vague or doubtful." *The New Oxford Dictionary* 447 (2001). Here, the parties stipulated to the fact that Panado was injured during her work shift on October 8–9, 2004. The time and place of injury is neither vague nor doubtful in this case.

The Board of Trustees also argues that interpreting HRS § 88–79 to permit recovery when Panado cannot point to the specific moment of injury would render the "definite time and place" language "superfluous, void, or insignificant." *See Beneficial Hawaii, Inc. v. Kida*, 96 Hawai'i 289, 309, 30 P.3d 895, 915 (2001) ("[C]ourts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant." (Citations omitted)). This contention is without merit. Rejecting the Board of Trustees' overly narrow interpretation of "definite time and place" does not mean jettisoning the "definite time and place" requirement. Instead, Panado satisfied the "some definite time and place" requirement by establishing that she was injured during her October 8–9, 2004 work shift.

Accordingly, based on the commonly accepted meaning of "definite," a showing that the injury occurred during Panado's October 8–9, 2004 work shift does satisfy HRS § 88–79's "some definite time and place" requirement.[12]

Even assuming the statutory provision is ambiguous, the legislative history does not indicate the legislature intended "definite time and place" to restrict disability benefits to those who could show the specific moment of injury. *First Ins.*, 126 Hawai'i at 415, 271 P.3d at 1174 ("[w]hen a statute contains an ambiguity . . . . courts may resort to extrinsic aids in determining legislative intent, such as legislative history") (quoting *Wheeler*, 121 Hawai'i at 390, 219 P.3d at 1177).

The "some definite time and place" language has been part of the provision on accidental disability retirement benefits ever since the territorial legislature first established Hawaii's employee retirement system in 1925. *See* 1925 Haw. Sess. Laws Act 55, § 6(5) at 59–60. The first accidental disability provision stated that:

> Upon application of a member, or of the head of his department, any member who

---

**12.** There could be a line-drawing issue in other cases regarding how long a period of time must be before it no longer is "definite." However, it is unnecessary to decide the issue here because in the instant case there is no dispute that the injury occurred during a specific and defined period of work.

has been totally and permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, through no negligence on his part, shall be retired by the board of trustees, provided that the medical board shall certify that such member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired.

*Id.*

The 1925 Territorial Legislature's Joint Committee on Pensions issued a Special Committee Report that outlined the main provisions of the proposed Bill regarding the territorial government's employee retirement system, including the accidental disability provision quoted above. H. Spec. Comm. Rep. No. 7 at 1 (1925). The territorial legislature did not appear to address the "some definite time and place" language. Instead, the territorial legislature was concerned with whether an accident occurred during work, not with whether the employee could pinpoint the exact moment of injury. For example, the report explained that, "Disability benefits are paid upon permanent disability as the result of an accident in the performance of duty at any time or upon disability from any cause after the employee has had ten or more years of service." *Id.* at 7. The report later discussed the disability benefits provision in more detail, stating that, "The plan provides that a distinction shall be made in the cases of permanent disability that occur as a result of accidents in the performance of duty and those due to ordinary causes for which the government is not directly responsible." *Id.* at 27. Likewise, the report noted that, "In the case of total and permanent disability due to an accident in the performance of duty the committee believed that a pension should always be payable regardless of the age or length of service of the member." *Id.* As the above examples show, every reference to the provision on accidental disability benefits did not indicate that "some definite time and place" or any other part of the provision required a claimant to specify the exact moment of injury. The key question reiterated by the committee at several points was whether the accident occurred "in the performance of duty." The legislative history does not indicate the "some definite time and place" language was meant to restrict the award of accidental disability retirement benefits to those claimants who could show an exact moment of injury.

The legislature's subsequent expansion of coverage under HRS § 88–79 also counsels against the restrictive interpretation adopted by the circuit court. In 1965, the legislature amended the service-connected total disability statute to include a second category of recovery for any member of the retirement fund "who has been permanently incapacitated ... as the cumulative result of some occupational hazard[.]" *See* 1965 Haw. Sess. Laws Act 225, § 1(a) at 355. This court has subsequently interpreted "occupational hazard" to permit a claimant to recover when he or she has been exposed to a danger accompanying a particular job "if it is not a risk common to employment in general." *See Komatsu v. Bd. of Trs., Employees' Ret. Sys.,* 67 Haw. 485, 494, 693 P.2d 405, 412 (1984) (quoting *Lopez,* 66 Haw. at 129, 657 P.2d at 1042). Given the legislature's decision to expand coverage, it would appear contrary to legislative policy to restrict coverage by interpreting HRS § 88–79 to categorically preclude claims that do not allege the exact moment of injury, even when it is undisputed that the injury occurred in the performance of work.

In addition to the lack of support in the legislative history, there are several other reasons for not adopting the Board of Trustees' narrow reading of HRS § 88–79's "some definite time and place" language. One reason for rejecting the Board of Trustees' interpretation is it unreasonably excludes those service-connected disabilities in which symptoms do not manifest at the exact moment of the accident. In fact, the Medical Board appeared to read this exclusion into HRS § 88–79, by arguing that the provision requires that an accident immediately manifest pain to be recoverable. The Medical Board determined Panado did not suffer an "accident" because her pain symptoms manifested the next day. Dr. Chinn, a member of

the Medical Board who also testified on its behalf, stated that "[a]n accident . . . is not something that occurs and then develop[s] symptoms the following day." Dr. Chinn further testified that "when you have an accident you have usually immediate symptoms" and that, the "ERS definition of accident is pretty clear. It's got to occur at a specific date and time and in general, there's an immediate complaint of pain or disability." Thus, when asked about whether Panado had suffered an accident, given that she experienced pain the following day, Dr. Chinn stated, "No. Especially because her pain was described as occurring the following day."

The Hearing Officer relied on Dr. Chinn's testimony in finding that Panado's October 8–9 incident did not constitute an accident. In her Recommended Decision, the Hearing Officer concluded that, "[t]he fact that [Panado] reported twice that she was not injured until the next day is significant," then quoted Dr. Chinn's testimony that, "generally when you have an accident you have usually immediate symptoms." As discussed supra, the Board of Trustees adopted the Hearing Officer's Recommended Decision.

However, there is no indication the legislature intended to categorically exclude coverage for accidents that do not result in immediate symptoms. Although Dr. Chinn testified that the "ERS definition of accident is pretty clear" that there must be "an immediate complaint of pain or disability[,]" the plain language and legislative history of HRS § 88–79 do not include such a requirement.

The existence of accidents that do not result in immediate symptoms calls into question the reasonableness of denying benefits when the claimant can point to the exact period of work during which an accident occurred, but is unsure of which exact act caused his or her incapacitation. Using a slight variation on the facts in *Myers*[13] as an example: If in *Myers*, the employee had lifted the coffee maker twice, but the onset of the same debilitating condition did not occur until the next day, there is no rational explanation why the employee should be denied retirement benefits because he could not point to which one of the two lifts caused the incapacity. So long as the claimant could establish the incapacity was the proximate and natural result of either of the two lifts, the claimant should be able to qualify for disability retirement benefits under HRS § 88–79.[14] To deny benefits in this situation, either because a claimant cannot point to which exact incident, or because the onset of pain did not occur immediately, would be "unjust and unreasonable in its consequences." *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998).

Accordingly, the Board of Trustees erred in concluding that Panado did not suffer "an accident occurring while in the actual performance of duty at some definite time and place."

However, since the circuit court did not address the Board of Trustees' second ground for denying Panado's application, that "[Panado's] permanent incapacity is not the natural and proximate result of the alleged incident[,]" we remand with regard to that issue.[15]

---

13. *Myers* is not determinative of whether Panado's incident is an "accident" under HRS § 88–79. Although *Myers* and the instant case are factually similar because both involved claimants who suffered injuries as a result of lifting something, *Myers* is not dispositive because it is distinguishable with regard to the key issue here, whether a claimant under HRS § 88–79 must prove the specific moment of injury. Whereas Panado "acknowledges that she is uncertain as to exactly when on October 8–9, 2004 her injury occurred," *Myers* was able to point to the moment he injured himself, when he lifted the coffee pot and heard a snap, *see* 68 Haw. at 95, 704 P.2d at 903. Thus, *Myers* did not provide guidance as to how to interpret the "a definite time and place" requirement of HRS § 88–79. Accordingly, *Myers* does not control the instant case.

14. In fact, the circuit court recognized that some injuries cannot be pinpointed to a specific instance. At the September 14, 2012 hearing, the Board of Trustees' counsel argued that in *Myers*, "there [was] a physical symptom that pinpoints, much like a car accident. If there is a time and place where the accident occurs and an impact occurs, people can pretty much pinpoint that." However, the circuit court disagreed, pointing out that "soft tissue and low impact" accidents may not develop symptoms until much later.

## IV. Conclusion

For the foregoing reasons, the ICA's judgment is vacated, the circuit court's judgment and "Decision And Order Affirming The Final Decision of the Board Of Trustees Of The Employees" Retirement System Of The State Of Hawai'i are vacated. The case is remanded to the circuit court for further proceedings consistent with this opinion.

15. We also note two observations for the court on remand. First, given that the Board of Trustees' FOF 22 and COL 2 refer to the lack of an accident, on remand, the court will have to determine whether our analysis affects the validity of those holdings.

Second, we disagree with the Board of Trustees' conclusion that, "[s]ince [Panado] had returned to work and was able to perform all of the duties of her full-time job by the October 24, 2005 date of Dr. Maruyama's IME, [Panado's] permanent incapacity cannot be said to naturally follow from the alleged accident." A claimant's return to work does not, in and of itself, prove a lack of causation between the accident and the later incapacitation. *See, e.g., Jewel Tea Co. v. Indus. Comm'n,* 39 Ill.2d 180, 233 N.E.2d 557, 559 (1968) (stating that "a claimant's return to work after an accident is not determinative of causation between the accident and subsequent disability"); *Walker v. United Parcel Serv.,* 262 Mont. 450, 865 P.2d 1113, 1116–17 (1993) ("[workers' compensation claimant's] return to work is not relevant to the causation issue."). As a matter of common sense, "the fact that [a claimant] returned to his [or her] regular job does not indicate that he [or she] was completely well or that he [or she] was experiencing no pain." *Walker,* 865 P.2d at 1116–17. Moreover, from a policy perspective, a return to work despite continuing pain or injury should not be held against an employee in the determination of benefits. Doing so would disincentivize employees from going back to work for fear that returning would disqualify them from receiving benefits. On remand, the fact that Panado went back to work in the time between her October 8–9, 2004 incident and her later permanent incapacitation should not be construed as proof that the incapacitation did not naturally and proximately result from the October 8–9, 2004 incident.