## LINA M. KIKUTA, Co-Executrix of the Estate of WILLIAM P. MORIYAMA, Deceased, Appellant, *v.* BOARD OF TRUSTEES OF THE EMPLOYEES' RETIREMENT SYSTEM, State of Hawaii, Appellee

### NO. 7354

### CIVIL NO. 53482

### FEBRUARY 1, 1983

### LUM, ACTING C.J., NAKAMURA, J., AND RETIRED JUSTICES OGATA AND MENOR, ASSIGNED TEMPORARILY*

*Per Curiam.* This is an appeal by Lina M. Kikuta, Co-Executrix of the Estate of William P. Moriyama, deceased, from the judgment of the circuit court affirming the denial by

---

* Chief Justice Richardson, who heard oral argument in this case, retired from the court on December 30, 1982. HRS § 602-10 (1982 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

the Board of Trustees of the State Employees' Retirement System (hereinafter "Board") of the appellant's claim for service-connected total disability retirement benefits.

The decedent, William P. Moriyama, was employed as a Tax Returns Examiner III for the State Department of Taxation. He was a member of the retirement system.

On Wednesday, August 30, 1972, at about 2:50 p.m., the decedent was sitting at a table with fellow workers in the employees' lounge in the state tax office at 425 Queen Street, Honolulu, Hawaii, during the afternoon recess, or coffee break, when Peter K. Kahuhu, the brother of the decedent's late sister-in-law, entered the lounge. When Kahuhu entered the employees' lounge, Moriyama was informed that his friend was there and went to meet him. The two were engaged in conversation when Kahuhu was heard to say to Moriyama, "You did me wrong yesterday, you son of a bitch." He then jabbed Moriyama in the stomach and groin area with a black metal-tipped umbrella, punched him in the face several times, and finally stabbed him in the left eye with the metal tip of the umbrella. When one of the employees, Henry Mika, tried to stop Kahuhu from continuing his assault upon Moriyama, the assailant shouted to Mika, "If I had a gun I would shoot you." Moriyama was taken to St. Francis Hospital where he died five days later on September 4, 1972. At the time of the assault, Kahuhu was 68 years of age and Moriyama was 60 years of age.

On September 1, 1972, before Moriyama's death, an application for service-connected total disability retirement was filed by Ralph W. Kondo, Director of the State Department of Taxation, on behalf of the decedent. The designated beneficiaries were his children, Mrs. Lina M. Kikuta, Mrs. Wilma M. Go, Marcia Moriyama, John P. Moriyama and Dean P. Moriyama.

The Board denied the application and Mrs. Kikuta, as co-executrix, appealed to the Board pursuant to its rules. Mr. Kenneth K. Saruwatari was appointed the hearing officer to hear the appeal. In his "Recommended Findings of Fact, Conclusions of Law and Decision," Mr. Saruwatari expressed the opinion that "[w]here a State employee is disabled as the natural and proximate result of an accident occurring while he is at his place of employment during working time, through no

willfull negligence on his part, he is entitled to be retired for service-connected total disability." Accordingly, he recommended that the application be approved and that service-connected total disability benefits be authorized under HRS § 88-77. The Board, however, rejected the hearing officer's recommendations and reaffirmed instead its earlier ruling that the injury resulting in Moriyama's disability and subsequent death was not the result of an "accident" within the meaning of HRS § 88-77.

The appellant thereafter appealed the Board's decision to the circuit court. The court affirmed the Board's decision, finding the facts to be that the decedent had been warned prior to the fatal injury that his assailant was "out to get him," and that the assailant attacked the decedent for personal reasons unrelated to the decedent's employment as a tax returns examiner. It then concluded that while the evidence showed that the decedent was permanently incapacitated for gainful employment, "such incapacity was not the result of an accident occurring while the decedent was engaged in the actual performance of his duties as a tax examiner, but the result of a criminal assault stemming from a personal dispute between the applicant [decedent] and the assailant." The present appeal to this court followed.

HRS § 88-77(a) provides in pertinent part that "[u]pon application of a member, or of the head of his department, any member who has been permanently incapacitated as the natural and proximate *result of an accident occurring while in the actual performance of duty at some definite time and place* . . . may be retired by the board of trustees for service-connected total disability provided . . . . [there has been no willful negligence on the claimant's part]." (Emphasis added) Both the Board and the circuit court expressly found that the injuries the decedent sustained were not the result of willful negligence on his part.

The Board presents a two-part argument in this appeal. First, it contends that the decedent was not injured as a result of an "accident" within the meaning of HRS § 88-77(a). Second, it argues that the decedent was not in the "actual performance" of his duties when he suffered his fatal injuries.

I.

Nowhere in the retirement laws is the term "accident" defined. But this court in the workers' compensation law context has defined the term to mean "an unlooked for and untoward event which is not expected or designed." *Chun Wong Chee v. Yee Wo Chan,* 26 Haw. 785, 793 (1923). This accords with the common and accepted definition of the term. It is an unexpected happening to which the claimant did not culpably contribute. The Board accepts this definition.

The Board also appears to recognize the widely accepted rule that an assault may be an accident within the meaning of the compensation act, when from the point of view of the injured workman, it is unexpected and without design on his part, although intentionally caused by another. *Myszkowski v. Wilson & Co.,* 155 Neb. 714, 53 N.W.2d 203 (1952); *Williams v. Salem Yarns,* 23 N.C. App. 346, 208 S.E.2d 855 (1974); *School District #1 v. Department of Industry,* 62 Wis. 2d 370, 215 N.W.2d 373 (1974). *See, generally,* 1 *Words and Phrases* (Perm. Ed.) 479 *et. seq.* We adopt this rule for the purposes of the retirement law. The Board, however, advances the following argument:

> There is no dispute that the injuries inflicted upon Decedent was the result of a willful and deliberate act of a third party. However, the police record which was jointly stipulated by the parties to form part of the evidence on record in this case indicates that prior to the incident in question, Decedent was already warned that the third party (his brother-in-law) was out to get him. By virtue of such previous warning, there is no doubt that Decedent knew of his brother-in-law's unlawful intentions when they met on that fateful day. Such knowledge and anticipation on the part of the Decedent that his brother-in-law is "out to get him" precludes this incident as an accident within the purview of the Retirement System Law.

The thrust of the Board's position is that since the deceased was aware of his assailant's intent "to get him" and should have anticipated the attack, it was not an unexpected happening and therefore not an accident as the term is herein defined. The evidence, however, is clearly to the contrary.

At least twelve people were interviewed by the police. Six of them were in the lounge area when the assailant, Kahuhu, arrived. Moriyama was seated at a table with several women employees at the time. One of these women was Patricia Ann De Costa. Like the other eyewitnesses, she was interviewed at the scene. The police report[1] recounts her statement:

Stated that shortly before 3:00 PM, 8-30-72, she was sitting at a table in the employee's lounge with MORIYAMA and a few other employees. She noticed the accused enter the lounge via the makai door, and since she had seen him several times in the past with MORIYAMA, informed MORIYAMA that his friend was there. BILL MORIYAMA then left the table and walked towards the accused, meeting him by the ewa wall of the lounge.

She paid them no attention for awhile, then heard raised voices, looked up, and saw the accused jab an umbrella very hard into MORIYAMA'S crotch, shouting, "You did me wrong, you son of a bitch!" MORIYAMA pitched forward a little, doubling up and holding his hands over his crotch.

Another eyewitness, Gloria Maureen Brito, described the incident to the police. The police report reads:

Stated that at approximately 2:50 PM, 8-30-72, she was sitting in the lounge area of the State Tax Office reading a newspaper, when she noticed the accused walk up to MORIYAMA and engage in conversation. She heard MORIYAMA say: "You going to give it to me now? That's not the way you said."

She saw the accused holding the front of MORIYAMA'S shirt with his right hand, holding MORIYAMA against the ewa wall of the lounge area, at the same time holding a black umbrella in his left hand, grasping it about mid-way along the stem.

---

[1] By stipulation, the police investigation of the incident was substituted for witness testimony.

The accused continuously jabbed MORIYAMA in the stomach area with the metal tip of the umbrella, saying: "No, no. You did me wrong. You did me wrong yesterday." She heard MORIYAMA answer: "No, no. Wait! Cool it, cool it!"

She then saw the accused holding the front of MORIYAMA'S shirt with his left hand, at the same time holding the umbrella in the same hand, and punch MORIYAMA about three times on the left side of his forehead with his right fist.

In a later interview with the police, Ms. De Costa related that for the past three years or so before the incident, she had seen the accused and the decedent together at the tax office, more or less on a regular basis. They appeared to be on a friendly footing and had never been heard by her to argue with each other. Henry Mika, another tax office employee, also told the police that he, too, had seen the accused with Moriyama at least once or twice a week since 1969; that they always appeared friendly towards each other; and that they never argued or raised their voices. There were similar statements from other witnesses. None of those present saw or heard anything to indicate that Kahuhu was looking for trouble when he first arrived. Moriyama gave no indication when he stood up to greet Kahuhu that he was expecting an attack from his visitor.

The only reference, by any witness to the fact that Kahuhu was "out to get" Moriyama is to be found in the police interview with Kahuhu's sister, Cecilia Helekahi. She recalled that sometime around the end of March, 1972, her other brother, Alapai, had told her that Pete (Kahuhu) was angry with Moriyama and that he was "out to get" him. Helekahi said that she immediately called Moriyama to warn him that Pete was out to get him. She had always thought highly of the decedent, and found him to be a kind and generous man. This warning was given *some five months before the attack.* Meanwhile, the decedent and Kahuhu continued to see each other regularly, always apparently on a friendly basis.

From the foregoing, we find no difficulty in holding that the decedent was injured in an accident as we have herein defined the term. There is nothing in the record to indicate that

the deceased had provoked Kahuhu into attacking him. Neither is there any evidence to show that the assault was other than unexpected.

## II.

Whether the decedent was injured "while in the actual performance of duty," HRS § 88-77, presents a somewhat more serious problem. We think, however, that the hearing officer correctly construed the quoted statutory language when he wrote:

> The decedent was at his place of employment, the Department of Taxation building, during the hours of work usual for State employees. He was not, literally speaking, examining a tax return. However, it would be absurd to say that the State requires four hundred and sixty minutes of actual poring over tax returns each working day from a Tax Returns Examiner III. Surely, an employee is in the actual performance of his duties at the time he is using the rest room, or even when a superior stops by to repeat the latest joke he had heard. Also, the legislature, in its wisdom, chose to differentiate between lunch periods and "coffee breaks" or recesses. It specifically states that lunch periods do not constitute working time, Sec. 80-1, HRS, while it did not lay down such an edict on recesses, Sec. 80-2, HRS.
>
> Decedent, therefore, was at his place of employment, in an area set aside for his use at recess time, and the assault occurred during working time—the recess.

We agree with the hearing officer that the interpretation placed upon the statute by the Board and by the circuit court could very well lead to other absurd and unjust results. Suppose the decedent had been on his way to the water cooler when he was assaulted? Or suppose he was at his desk having his coffee break when he was attacked?

The decedent was on his "working time" when he was injured. HRS § 80-1. He was on an authorized ten-minute recess at the time. *See* HRS § 80-2. This break in the working

routine has been viewed as a benefit to the employer on the plausible theory that "a refreshed employee is often a more productive one." *Pacheco* v. *Orchids of Hawaii,* 54 Haw. 66, 69, 502 P.2d 1399, 1401 (1972). He was injured on working premises—in an area which was part of the office complex where he worked. The room where he was attacked had been specifically set aside for the use of employees who were either resting or having their coffee breaks. And it was so used by the tax office employees. In these circumstances, we find that the decedent was injured "while in the actual performance of duty at some definite time and place." HRS § 88-77.

Reversed.

*Hiram K. Kamaka* for appellant.

*Harriet Lewis,* Deputy Attorney General for appellee.