**Electronically Filed
Supreme Court
SCAP-15-0000582
10-JUL-2017
08:07 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

ROSEMARY H. STOUT, Appellant-Appellant,

vs.

BOARD OF TRUSTEES OF THE EMPLOYEES' RETIREMENT SYSTEM,
STATE OF HAWAI'I, Appellee-Appellee.
_____

SCAP-15-0000582

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-15-0000582; CIV. NO. 14-1-2428-11)

JULY 10, 2017

RECKTENWALD, C.J., McKENNA, POLLACK, WILSON, JJ.,
WITH NAKAYAMA, J., DISSENTING

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This case concerns whether a public school teacher who is a member of the Employees' Retirement System of the State of Hawai'i ("ERS") through her regular full-time position is eligible for "service-connected disability retirement" benefits

under HRS § 88-79 (Supp. 2004) after being shot in the chest while serving as a public summer school teacher, which is a position that, when held on its own, does not provide ERS membership eligibility.  Rosemary H. Stout ("Stout"), a regular school year teacher employed by the State of Hawai'i Department of Education ("DOE"), applied for benefits under HRS § 88-79 on August 3, 2004 based on injuries suffered as a result of a June 30, 1988 shooting.  Despite a determination by the Medical Board to the ERS ("Medical Board") that Stout was incapacitated from teaching due to the shooting, on October 27, 2014, the Board of Trustees of the ERS ("ERS Board") issued a Final Decision denying Stout's application on the threshold basis that although she was an ERS member, she was not entitled to "service-connected disability retirement" under HRS § 88-79 because the shooting occurred while she served as a part-time summer school teacher, which was not employment that qualified for ERS membership.

On July 28, 2015, the Circuit Court of the First Circuit ("circuit court")[1] affirmed the ERS Board and entered Final Judgment.  Stout timely appealed to the Intermediate Court of Appeals ("ICA").  This court accepted a transfer of this case from the ICA.

---

[1]  The Hon. Rhonda A. Nishimura presiding.

We hold that Stout is eligible for "service-connected disability retirement" under applicable law. HRS § 88-79 provides that an ERS member may be retired by the ERS for "service-connected disability retirement" if she is "permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place . . . ." The issue is whether Stout's injury is "service-connected." HRS § 88-21 (Supp. 2004) defines "service" to include any "service as an employee paid by the State or county," and contains additional language indicating that "connected" service includes non-ERS-membership State or county service, as long as the member makes ERS contributions during the time of such non-ERS-membership State or county service. Stout was making ERS contributions on June 30, 1988. HRS § 88-21 also separately defines "membership service" as "all service rendered by a member for which the member had made the required contributions to the system." Therefore, although Stout's summer school employment at 'Aiea High School was not "membership service," it was nevertheless "service," and HRS § 88-79 provides for "service-connected disability retirement," not "membership service-connected disability retirement." Accordingly, under HRS § 88-79, Stout is eligible to apply for "service-connected disability

3

benefits."  This conclusion is also supported by legislative history and the statutory scheme of HRS Chapter 88.

We therefore vacate the judgment of the circuit court and remand this case to the ERS Board for further proceedings consistent with this opinion.

## II.  Background

### A.  Stout's Employment and ERS Membership History

Stout first began working for the DOE in the early 1980s, teaching at various locations including Waialua Intermediate and High School, 'Aiea Intermediate School, and on Kaua'i.  Stout became tenured in 1985.  During the 1987 to 1988 academic year, Stout taught at Radford High School ("Radford").  During the summers of 1985 through 1988, the DOE offered a summer school program to students at 'Aiea High School ("'Aiea") and employed Stout each summer to teach an English class there.

By 1984, Stout was a member of ERS.  She contributed to the ERS fund year-round through deductions taken from her academic-year salary, which was paid by the DOE over the course of twelve months.  Stout's summer school earnings were paid by the DOE based on an hourly rate by way of separate checks.  No deductions from summer school earnings were made for ERS contributions.

4

**B.    Stout's Injury: the June 30, 1988 Shooting**

Stout was shot on June 30, 1988 by Romel Castro ("Castro") — a then-eighteen-year-old student of Stout's — while she was teaching summer school at 'Aiea.  See Tradewind Ins. Co. v. Stout, 85 Hawai'i 177, 181, 938 P.2d 1196, 1200 (App. 1997) (stating facts elicited at Castro's criminal trial).  On February 2, 1990, Castro was convicted of attempted second degree murder and a firearms violation.  See id.  He was sentenced to life imprisonment with the possibility of parole.  See id.

**C.    Application for Benefits to the ERS Board**

Stout filed an "Application for Disability Retirement Contributory Plan" ("Application") with the ERS Board on August 3, 2004, requesting "service-connected disability retirement."  She indicated that the accident which caused her disability was "shot by student in chest" on June 30, 1988 at 'Aiea High School.

On October 4, 2004, an "Employer's Statement Concerning Service-connected Disability" was completed by the DOE.  Specifically, the DOE identified itself as, "Department of Education – Radford High School," and declared that it did not employ Stout on the date of the shooting, and that it lacked records of any accident.  Despite this,  the "Department of Education – Radford High School" stated the place of Stout's accident as "Aiea High School – Summer Session," Stout's work

performed as "language arts teacher – Summer Session at Aiea High School," and that Stout was "'on duty' at the time of the accident . . . at Aiea High School."

The Medical Board of the ERS interviewed Stout and reviewed her Application and various employment and medical records, including the October 2004 statement from "Department of Education – Radford High School." It issued a report dated February 17, 2006, finding that Stout was occupationally incapacitated, likely permanently, due to psychiatric conditions which precluded a return to work as a teacher, but that evidence did not show that she was incapacitated for gainful employment in other occupations. The Medical Board further found the June 30, 1998 shooting to have been an "accident" that was the "natural and proximate cause" of Stout's incapacitation, and that the accident occurred when Stout was "in the actual performance of duty at some definite time and place." The Medical Board determined that Stout's incapacity was not the result of her "willful negligence," which would preclude recovery under HRS § 88-79. The Medical Board ultimately recommended that Stout be granted "Service-Connected Occupational Disability Retirement,"[2] but that her request for "Service-Connected Total Disability Retirement" be denied.

---

[2] "Upon retirement for service-connected disability, a member shall receive the amount of the member's accumulated contributions and a retirement
(continued . . .)

HRS § 88-79 permits the ERS Board to accept as conclusive the Medical Board's finding that Stout's "disability [wa]s the result of an accident occurring while in the actual performance of duty at some definite time and place and that the disability was not the result of wilful negligence on [Stout's] part," and approve the member's eligibility for a service-connected disability retirement benefit.  HRS § 88-79(d)(2).[3]  Here, however, after reviewing the Medical Board's report, the ERS Board issued an April 19, 2006 "Order Remanding Report to Medical Board," indicating that in its view, Stout was not entitled to benefits:

> [S]ection 88-42.5,[4] Hawaii Revises [sic] Statutes, and section 6-21-14(2),[5] Hawaii Administrative Rules, exclude

---

(. . . continued)
allowance which shall consist of fifty per cent of the member's average final compensation."  HRS § 88-80 (Supp. 2004).

[3]        The board may determine whether or not the disability is the result of an accident occurring while in the actual performance of duty at some definite time and place and that the disability was not the result of wilful negligence on the part of the member.  The board may accept as conclusive:
             (1) The certification made by the head of the agency in which the member is employed; or
             (2) A finding to this effect by the medical board.

HRS § 88-79(d).

[4]        **Membership of employees holding more than one position, appointment, or office.**  (a)  The membership of any employee holding more than one full-time position, appointment, office, or any combination thereof shall be limited to the position, appointment, or office of the employee's option; provided that the employment in the position, appointment, or office shall meet the minimum membership eligibility requirements as provided in this part.  Any contributions made based on the compensation, pay, or salary of the employee's position, appointment, or
(continued . . .)

teaching summer school from a public school teacher's Employees' Retirement System membership. An accident resulting in injury to a public school teacher while the teacher is teaching summer school is therefore not "an accident occurring while in the actual performance of duty" under sections 88-77 and 88-79, Hawaii Revised Statutes.

On this basis, the ERS Board remanded the report to the Medical Board for further proceedings.

The chair of the Medical Board, Patricia L. Chinn, M.D., J.D. ("Dr. Chinn"), issued a memorandum dated May 19, 2006, acknowledging the ERS Board's Order Remanding Report to Medical Board. Dr. Chinn continued, however:

> The Medical Board respectfully declines to revise its recommendation. The Medical Board does not believe it has sufficient information concerning this Member's employment status and is unfamiliar with and has no expertise on the requirements concerning membership. It also appears to the Medical Board that this case involves an interpretation of the statute and rule regarding the exclusion from membership and the performance of duty, an interpretation that is best left to the Trustees.

---

(. . . continued)
office other than that on which the employee's membership is based shall be returned to the employee.
The foregoing shall not apply to any employee holding two part-time positions of the same class if each position meets the minimum eligibility requirements for membership, and the sum total of the compensation, pay, or salary received for both positions does not exceed the higher of the full-time compensation, pay, or salary for either position.

HRS § 88-42.5 (Supp. 2003).

[5] **Employees excluded from membership.** The following classes of employees shall be excluded from membership in the system: . . . ; (2) Persons employed on short-term or temporary appointments of three months or less; (3) Persons employed as substitute teachers; . . . ; (5) Persons in any position requiring less than one-half or fulltime employment . . . .

HAR § 6-21-14.

Dr. Chinn issued a follow-up memorandum on July 15, 2007 adding: "The only possibility of granting the Member benefits [on the basis of the June 30 shooting] is if she is considered a member for the purposes of qualifying for retirement benefits but not for the purpose of service credit while teaching summer school. We believe this is a matter for the Board to decide."

An ERS administrator, David Shimabukuro, subsequently issued an October 9, 2007 memo to the ERS Board that echoed the ERS Board's interpretation of HRS § 88-42.5 and HAR § 6-21-14(2). He concluded:

> [ERS] Staff therefore believes that services rendered in a position that is excluded from ERS membership should not be considered "an accident occurring while in the actual performance of duty" for the purposes of determining an individual's eligibility for accidental disability benefits and recommends that the Board deny Ms. Stout's applications for service-connected occupational and total disability retirement benefits.

Subsequently, a letter was issued to Stout on October 11, 2007 indicating the ERS Board's preliminary determination to deny her application for both service-connected occupational disability retirement benefits and service-connected total disability retirement benefits. The letter acknowledged that the ERS Board proposed to approve and accept the certifications, findings, and recommendations contained in the Report, except for the Medical Board's finding that Stout's disability was the "result of an accident occurring while in the actual performance of duty." The ERS Board opined that an accident incurred by a public

9

school teacher while teaching summer school is not "an accident occurring while in the actual performance of . . . duty."

On December 7, 2007, Stout timely filed an appeal of the ERS Board's proposed decision to deny both service-connected occupational disability retirement benefits and service-connected total disability retirement benefits.

**D.    Administrative Proceedings Regarding Cross-motions for Summary Judgment**

On February 25, 2009, Stout's appeal was assigned to a hearing officer. The parties agreed to address the threshold issue of whether Stout was eligible to apply for service-connected disability retirement, given that she was shot while teaching summer school for the DOE. Cross-motions for summary judgment were filed. A hearing on the motions was held on January 10, 2013.

On March 6, 2013, the hearing officer issued a Recommended Decision, determining that the main issue on appeal "is simply whether the summer school program at Aiea High School on June 30, 1988 was a covered employment under the Employees' Retirement System[.]" The hearing officer quoted the relevant statute that provides service-connected disability retirement, HRS § 88-79,[6] and concluded: "It goes without saying that this

---

[6]    Upon application of a member, or the person appointed by the family court as guardian of an incapacitated member, any member who has been permanently incapacitated for duty

(continued . . .)

requirement[, "while in the actual performance of duty,"] refers to employment that made contributions to the ERS in order to establish ERS coverage." Because Stout did not contribute any of her summer school earnings to the ERS (nor did the DOE contribute to the ERS based on Stout's summer school earnings), the hearing officer concluded that she did not satisfy the "while in the actual performance of duty" requirement. The hearing officer also noted that Stout was not "a member of ERS when she was injured on June 30, 1988 while a part-time summer school teacher" as "she was excluded from membership under HAR § 6-21-14." Lastly, the hearing officer commented that he agreed with the ERS Board's argument that "it would be unfair to all other members of the ERS to have retirement benefits taken by [Stout] out of ERS funds when neither the DOE nor [Stout] made the requisite contributions for such retirement benefits from her part-time temporary summer school earnings."

On July 15, 2013, the ERS Board issued a Proposed Decision, which adopted the Recommended Decision and incorporated the hearing officer's findings of fact and conclusions of law as its

---

(. . . continued)

> as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, or as the cumulative result of some occupational hazard, through no wilful negligence on the member's part, may be retired by the board [] for service-connected disability . . . .

HRS § 88-79 (emphasis added).

11

proposed decision, and denied Stout's application for service-connected disability retirement benefits.

Stout timely filed exceptions to the proposed decision. She took issue with the hearing officer's failure to explain why the statement by "Department of Education – Radford High School" that Stout was "'on duty' at the time of the accident" was "unimportant." Stout also pointed out the hearing officer failed to indicate whether the standard of review for summary judgment motions were followed, did not discuss several cases she had cited to in her briefs such as Hua v. Board of Trustees of the Employees' Retirement System, State of Hawai'i, 112 Hawai'i 292, 145 P.3d 835 (App. 2006), and Kikuta v. Board of Trustees of the Employees' Retirement System, State of Hawai'i, 66 Haw. 111, 657 P.2d 1030 (1983), and inappropriately relied on declarations submitted by the State.

The ERS Board held a hearing on September 23, 2014. After the parties presented their arguments, the ERS Board elicited the following information from counsel: summer school teachers generally are DOE teachers because most DOE teachers are certified and there is a preference that summer school teachers have teacher's certificates; summer school employment is not required of tenured DOE teachers and is voluntary; and funding for summer school is paid out of a separate fund composed of student summer school tuition.

12

At the hearing, one of the board members suggested that had Stout been shot during school hours during the academic year, there would have been no issue as to whether or not Stout's injury was a service-connected disability.  Another board member, who worked for the DOE, stated that she "d[id] know that summer school needs to be self supporting [sic]" based on student tuition.  That board member also stated: "I'm really clear . . . in the fact that I know that teachers, if they choose to teach summer school, they're just at risk because they're not covered . . . even though they're DOE employees."  She went on to express concern that the record lacked much information regarding Stout's incapacity, and suggested that had that been looked at more closely in the case, "it would have made things much easier for this board to be able to look at something like granting."  Stout's counsel then clarified that based on an agreement with opposing counsel and the hearing officer, the record was focused on the threshold issue of whether Stout was legally entitled to apply for benefits, and not on Stout's medical condition.

On October 27, 2014, the ERS Board issued its Final Decision.  The ERS Board explained that the "threshold issue in this appeal . . . is whether an accident that occurs in a non-member position can be the basis for service-connected disability retirement benefits."  It explained, therefore, that

Hua and Kikuta were inapplicable to the case because they did not concern this issue.  The ERS Board acknowledged that Stout was granted workers' compensation benefits, including ERS credits, based on the June 30, 1988 shooting; however, it stated: "The ERS's uniform practical construction of the statutes and rules[, e.g., HRS §§ 88-42.5, 88-43, 88-77, 88-79; HAR § 6-21-14,] involved in this appeal has been that ERS members are not entitled to service-connected disability retirement based on accidents that occur when they are performing duties in non-membership employment positions." Accordingly, the ERS Board affirmed the Proposed Decision and adopted the Recommended Decision, and therefore denied Stout's applications for service-connected occupational disability retirement benefits and service-connected total disability retirement benefits.

**E.   Circuit Court Proceedings**

Stout timely filed a notice of appeal to the circuit court. Oral argument was held on July 10, 2015 after the parties submitted their briefs.  Stout argued that the court should "keep in mind" the "obvious remedial social purpose of any public employee retirement system" and the borrowed use of workers' compensation tests in ERS cases such as Hua and Kikuta. Stout argued that key facts supporting Stout's eligibility for benefits were that she was on State property, and that she was

14

doing something related to her State employment.  Specifically, at the time she was shot, Stout was "doing what she was supposed to do: Public school teacher, helping her students, teaching her students, benefiting the [S]tate of Hawaii."  Stout also asserted that the declaration given by DOE employee Wilfred Keola, Jr. ("Keola") regarding the operations and funding of summer school and interpretation of Stout's paystubs ("Keola Declaration"), should not have been admitted because it was not based on the declarant's personal knowledge.

The circuit court orally dismissed the appeal and affirmed the decision by the ERS at the end of the hearing.  In its written order, the circuit court found it dispositive that because no ERS contributions were made with respect to Stout's summer school employment, "when . . . Stout was injured on June 30, 1988, she was performing duties in a part-time temporary employment position that was excluded from and not covered by ERS membership and benefits."

**F.   Appellate Review**

Stout timely filed her Notice of Appeal with the ICA on August 17, 2015, and filed an Application for Transfer on April 4, 2016.  This court granted the Application for Transfer and held oral argument.

15

### 1.    Stout's Position

Stout presents five points of error: the circuit court erred by (1) failing to determine that Stout was injured in the "actual performance of duty," (2) disregarding the application to her case of Kikuta and Hua, (3)-(4) failing to determine the ERS Board erred by considering improperly admitted evidence and DOE Regulation 5105, and (5) improperly considering HRS §§ 88-42.5, 88-43 (Supp. 2004), and HAR § 6-21-14 in determining that Stout was not covered by ERS membership and benefits when she was shot on June 30, 1988.

We focus on Stout's first point of error, as it is dispositive.  With respect to this issue, Stout asserts the following evidence was not properly considered by ERS, the hearing officer, or the circuit court: (1) that the DOE had acknowledged that Stout was "on duty" "at Aiea High School" at the time of the shooting, and that the Medical Board concluded the shooting was an accident occurring "in the actual performance of duty at some definite place and time"; (2) that, on June 30, 1988, Stout was a continuously employed, permanent, year-round public school teacher; (3) that, on June 30, 1988, Stout was a contributing ERS member; and (4) that Stout received workers' compensation benefits associated with the injuries she suffered following the June 30, 1988 shooting, and that ERS

16

contributions were taken from those benefits such that she would continue earning "retirement credits."

Stout also points out that on June 30, 2008, the DOE was her sole employer and that the DOE benefited from the work she performed on the date of the accident. She argues she was shot while teaching an English class on DOE premises, which benefited the public education system and the State of Hawai'i. She also observes that nothing in the applicable HRS chapters indicates that a public school teacher is an employee of a particular campus instead of being a State of Hawai'i employee. She asserts that because the DOE had acknowledged that Stout was on duty at one of its campuses at the time of the shooting, and because the Medical Board had determined she was "in the actual performance of duty at some definite place and time" when she was shot, pursuant to HRS § 88-79(d), ERS could have, and should have, adopted that conclusion.[7]

---

[7] With respect to the other points of error, in summary, Stout argues that the "liberal, remedial focus [of service-connected disability] reflected in" Kikuta and Hua provide the correct mode of analysis for Stout's circumstances and that the distinctions drawn by the ERS between Stout's situation and those in Kikuta and Hua are irrelevant. Stout also argues the Keola Declaration was inadmissible and should not have been relied upon by the hearing officer or the ERS because Keola lacked personal knowledge of the DOE summer school program as it had operated in 1988. She also asserts that the copy of the DOE internal policy, "Regulation 5105," attached to Keola's declaration, was inadmissible and should not have been considered by the hearing officer. Regulation 5105 states that part-time temporary employees, such as summer school teachers, are "[n]ot eligible for membership" for "[r]etirement." Finally, Stout also argues that HRS §§ 88-42.5, 88-43, and HAR § 6-21-14 were improperly construed so as to deny Stout service-connected disability benefits. Stout asserts the ERS should not be allowed to "blow hot and cold" by: (1) on the one hand, stating that because Stout did not
(continued . . .)

17

2.    **The State's Position**

The State asserts substantial evidence supports the ERS Board's finding that Stout's summer school teaching position was not an ERS membership position, and characterizes the issue on appeal as:

> whether Stout can claim service-connected disability retirement under [HRS] section 88-79 . . . based on an accident that occurred while she was performing duties in a part-time temporary employment position excluded from and not covered by the Employees' Retirement System ("ERS"), and for which no contributions were paid to the ERS either by Stout or her employer the Department of Education[.]

The State asserts that Stout's position is flawed as to the applicability of Hua and Kikuta, and whether evidence and certain sections of Chapter 88 of the Hawai'i Revised Statutes and Hawai'i Administrative Rules were appropriately considered, which were Stout's second through fifth points of error.  With respect to the dispositive first point of error, the State argues that HRS § 88-79, which provides for service-connected disability retirement benefits, implicitly requires the accident that caused the member's disability to have occurred while the member was performing duties in an employment position covered

---

(. . . continued)
contribute to the ERS with her summer school earnings, she was ineligible for benefits, and (2) on the other hand, preclude her from membership (and, therefore, making additional contributions) based on her summer school position.  As Stout's first point of error is dispositive, we need not address these other issues.

by ERS membership, i.e., "membership service."[8]   The State asserts that such a requirement is obvious from a consideration of the entire ERS statute, general legislative scheme and purposes, and to give the statute a rational and sensible interpretation and avoid absurd and unjust results.  The State argues that interpreting HRS § 88-79 in a manner contrary to its proposed interpretation would lead to the absurd result that academic-year school teachers "could claim service-connected disability retirement for accidents that occurred while they were working in part-time or temporary jobs including those for private employers, e.g., working as a part-time salesperson for a department store or teaching in a private summer school program."

The State further argues that the entire legislative scheme of Chapter 88 should be examined.  The State asserts that the general legislative scheme in HRS Chapter 88 ties both the funding of ERS retirement benefits and payment of those benefits to ERS members' performance of services covered by ERS membership and the payment of contributions for such service. The State cites to the following sections in support: HRS §§ 88-21 (definitions), 88-42.5 (membership of employees holding more than one position, appointment, or office), 88-45 (employee

---

[8]  "Membership service" is "all service rendered by a member for which the member had made the required contributions to the system."  HRS § 88-21.

contributions), 88-46 (deducting employee contributions from salary and employer pick up of employee contributions), 88-51 (membership service generally), 88-74 (allowance on service retirement), 88-75 (ordinary disability retirement), 88-76 (allowance on ordinary disability retirement), 88-80 (allowance on retirement for service-connected disability), 88-81(a) (average final compensation), 88-122 (determination of employer normal cost and accrued liability contributions). Moreover, the State asserts that to the extent HRS § 88-79 is ambiguous, the court should defer to the ERS Board's expertise and follow its interpretation and application of the statute.

### III. Standards of Review

### A. Interpretation of a Statute

Statutory interpretation is a question of law reviewable de novo. See Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007) (citation omitted). When construing statutes, the court is governed by the following rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

20

> When there is ambiguity in a statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent, such as legislative history, or the reason and spirit of the law.

114 Hawai'i at 193-94, 159 P.3d at 152-53 (citations omitted).

## B.  Administrative Agency Appeals

> Ordinarily, deference will be given to decisions of administrative agencies acting within the realm of their expertise. The rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose. Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation.

Coon v. City & Cnty. of Honolulu, 98 Hawai'i 233, 245, 47 P.3d 348, 360 (2002) (citations and brackets omitted).

## IV.  Discussion

It is undisputed that at all relevant times, Stout's sole employer was the DOE. In 1988, she served the DOE in two capacities: first, she was employed year-round to teach at Radford High School during the academic year; second, she was hired to teach during the summer at 'Aiea High School. Stout received her year-round salary semi-monthly, and made ERS contributions with each payment. She was paid separately for her summer school work and did not contribute — nor was she permitted by law to contribute — to the ERS from those earnings.[9]

---

[9]  See HRS § 88-42.5 ("Any contributions made based on the compensation, pay, or salary of the employee's position, appointment, or office other than that on which the employee's membership is based shall be returned to the employee.").

21

The parties further agree that Stout was a contributing member of ERS at the time of the June 30, 1988 shooting. Additionally, Stout's disability is a natural and proximate result of that shooting, which occurred while Stout was in the actual performance of duty at 'Aiea High School.  At issue is whether Stout is eligible for "service-connected disability retirement" benefits pursuant to HRS § 88-79, which is a matter of statutory interpretation.

## A.   Stout Is Eligible for Benefits under the Plain Language of HRS § 88-79

HRS § 88-79 states in relevant part:

> **Service-connected disability retirement.** (a)  Upon application of a member, or the person appointed by the family court as guardian of an incapacitated member, any member who has been permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, or as the cumulative result of some occupational hazard, through no wilful negligence on the member's part, may be retired by the board for service-connected disability; provided that:
>
> (1)  In the case of an accident occurring after July 1, 1963, the employer shall file with the system a copy of the employer's report of the accident submitted to the director of labor and industrial relations;
>
> (2)  An application for retirement is filed with the system within two years of the date of the accident, or the date upon which workers' compensation benefits cease, whichever is later;
>
> (3)  Certification is made by the head of the agency in which the member is employed, stating the time, place, and conditions of the service performed by the member resulting in the member's disability and that the disability was not the result of wilful negligence on the part of the member; and
>
> (4)  The medical board certifies that the member is incapacitated for the further performance of duty at the

22

time of application and that the member's incapacity is likely to be permanent.

. . . .

(d) The board may determine whether or not the disability is the result of an accident occurring while in the actual performance of duty at some definite time and place and that the disability was not the result of wilful negligence on the part of the member. The board may accept as conclusive:

(1) The certification made by the head of the agency in which the member is employed; or

(2) A finding to this effect by the medical board.

. . . .

HRS § 88-79.

HRS § 88-79, in both its text and its title, allows for the retirement of a member for "service-connected disability." Additionally, one of the four statutory requirements to obtain service-connected disability retirement is: "Certification is made by the head of the agency in which the member is employed, stating the time, place, and conditions of the service performed by the member resulting in the member's disability and that the disability was not the result of wilful negligence on the part of the member." See HRS § 88-79(a)(3). As the statute consistently uses the term "service" and no other,[10] our statutory inquiry necessarily turns on whether the accident

---

[10] Notably, HRS § 88-79(a)(3)'s requirement that certification be "made by the head of the agency in which the member is employed, stating the time, place, and conditions of the service performed by the member resulting in the member's disability," does not limit the disabling accident to have occurred in "the employment position covered by ERS membership." Rather, it focuses on the "service performed by the member," i.e., "service [(as an employee paid by the State or county)] performed by the member."

23

occurred when Stout was performing "service," i.e., whether the accident was "service-connected."

HRS § 88-21 defines "service" as follows:

> "Service":  service as an employee paid by the State or county, and also:  service during the period of a leave of absence or exchange if the individual is paid by the State or county during the period of the leave of absence or exchange; and service during the period of an unpaid leave of absence or exchange if the individual is engaged in the performance of a governmental function or if the unpaid leave of absence is an approved leave of absence for professional improvement; provided that, for the period of the leave of absence or exchange without pay, the individual makes the same contribution to the system as the individual would have made if the individual had not been on the leave of absence.  Cafeteria managers and cafeteria workers shall be considered as paid by the State, regardless of the source of funds from which they are paid.

(emphases added).  Notably, regardless if an employee is paid or on unpaid leave, certain acts by the employee are "service" so long as their performance was "paid by the State or county," of a "governmental function," or for approved professional improvement.  Accordingly, HRS § 88-79 provides for the retirement of members due to disability "connected" to any such governmental "service."

Specifically, the disability must be a "natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, or as the cumulative result of some occupational hazard, through no wilful negligence on the member's part."  HRS § 88-79.  Thus, the plain language of the statute imposes a requirement that the disabling accident occur while the member is "in the actual performance of

24

duty" to the State or county (or while performing a governmental function or pursuing professional improvement), and precludes service-connected disability benefits for a disabling accident at a member's non-State or non-county second job. Accordingly, there is no merit to the State's argument that the statute can be construed in a manner leading to the "absurd" result that HRS § 88-79 coverage extends to accidents occurring while a full-time public school teacher is working as a retail store clerk or private school teacher.

In sum, there is nothing ambiguous regarding HRS § 88-79's use of the terms, "service" or "service-connected." Thus, we reject a construction of the statute that conflates "service" with "membership" or "membership position," when those words are not in the statute. See Coon, 98 Hawai'i at 245, 47 P.3d at 360 ("[W]e have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation."). Here, as stated in the record, at the time of the accident, Stout was an ERS member and the service she performed for the State was "language arts teacher – Summer Session at Aiea High School." As such, Stout is eligible for benefits under the plain language of HRS § 88-79.

**B.    The Legislative History Also Supports the Plain Meaning of HRS § 88-79**

Our plain language interpretation is bolstered by the lengthy legislative history of the statute, which shows: 1) when the legislature enacted the predecessor to the ERS in 1925, it sought to provide a pension to all members who became disabled "due to an accident in the performance of duty"; 2) in 1963, the legislature specifically re-named and amended the "accidental disability benefit" statute to "service-connected" total and occupational disability benefit statutes; 3) the legislature has expanded the "service-connected disability benefit" over time; and 4) the legislature has revisited HRS § 88-79 or its predecessor statutes on numerous occasions, and it has consistently declined to limit "service-connected" disabling injuries to injuries that occur only in the course of "membership service."

Before 1925, there was no "uniform and established method of taking care of the employees who [we]re unable to continue in service on account of old age or disability," with the exception of some teachers who were covered by a plan established in 1915. Joint Comm. on Pensions of the Senate and House of Representatives ("Joint Committee"), Report on the Bill to Establish a Retirement System for Territorial Employees of the Territory of Hawaii 3-4 (1925) ("1925 Joint Report"). By 1925

26

the Territorial Legislature enacted Act 55, "An Act to Establish a Retirement System to Provide for the Retirement of Employees of the Territory of Hawaii and Teachers in the Public Schools," so that all government employees, including teachers previously covered under the 1915 plan, would be covered under the same retirement plan.  See 1925 Haw. Sess. Laws Act 55 (H.B. 396); 1925 Joint Report at 4.  See also Panado v. Bd. of Trs., Emps. Ret. Sys., 134 Hawai'i 1, 14, 332 P.3d 144, 157 (2014) (discussing the history of the ERS and citing the 1925 Joint Report).

As noted in the 1925 Joint Report that was submitted to the Territorial Legislature regarding H.B. 396, the plan's disability benefit distinguished between "cases of permanent disability that occur as the result of accidents in the performance of duty" [("accidental disability")] and those due to ordinary causes for which the government is not directly responsible [("ordinary disability")]."  1925 Joint Report at 27; compare 1925 Haw. Sess. Laws Act 55, § 6(3) at 59, with id. § 6(5) at 59-60; see also Panado, 134 Hawai'i at 14, 332 P.3d at 157 (quoting 1925 Joint Report at 27).

With respect to cases of ordinary disability "for which the government [wa]s not . . . responsible," a ten-year minimum service requirement was imposed to "reduce[] the cost to the government and protect[] the fund against early disabilities."

27

1925 Joint Report at 28; 1925 Haw. Sess. Laws Act 55, § 6(3). In contrast, there was no minimum service requirement for the receipt of benefits due to accidental disability, as the Joint Committee "believed that a pension should always be payable regardless of the age or length of service of the member" if the employee became disabled due to accidental causes in the "performance of duty." 1925 Joint Report at 27; see also id. at 37. The Joint Committee elaborated: "[f]or an example of the application of this benefit we may consider the case of an employee who, in an explosion occurring while at work for the government, loses his eyesight. In such a case, the government would provide him with a pension . . ." and a return of all contributions as an additional annuity.[11] Id. at 27 (emphasis added).

In other words, the legislature recognized that in cases where but for an employee's service to the government the employee would not have become disabled and unable to continue to work, that employee should receive some kind of retirement benefit regardless of the employee's duration of service and amounts contributed to the retirement system. See Panado, 134

---

[11] Any employee that left service prior to retirement age — including those who became disabled while at work for the government — was entitled to a return of all contributions. See 1925 Joint Report at 8 ("Employees' contributions are placed in a distinct and separate fund, called the Annuity Savings Fund. Each employee's contributions are credited to his own account and may be withdrawn if he leaves the service without a retirement allowance."); id. at 7 (stating that contributions are returned with interest or as an annuity in cases of disability, death, resignation, or dismissal).

Hawai'i at 14, 332 P.3d at 157 ("The key question reiterated by the [1925 Joint] [C]ommittee at several points was whether the accident occurred 'in the performance of duty.'"). The Joint Report gave no indication that the position in which a member became disabled was at all relevant; of foremost concern was whether the member was in service to the government when the disabling injury occurred.

In 1963, the legislature specifically re-named and amended the "accidental disability benefit" to the "service-connected total disability benefit" and "service-connected occupational disability benefit." See 1963 Haw. Sess. Laws Act 127, §§ 6-7 at 145-47; Revised Laws of Hawai'i ("RLH") §§ 6-46, 6-46.1 (Supp. 1963). The change was intended to "[p]rovide for a distinction in benefits as between service-connected total disability and service-connected occupational disability (incapacity for the purpose of duty)." S. Stand. Comm. Rep. No. 21, in 1963 Senate Journal, at 685. The use of the term "service-connected" in RLH §§ 6-46, 6-46.1 appears intentional, as at the time of the amendments, the definition of "service" was clear: "service as an employee paid by the State or county, and also service during the period of a leave of absence or exchange if the individual is paid by the State or county during the period of the leave of absence or exchange . . . ." RLH § 6-20 (Supp. 1963).

Notably, the legislature has expanded the service-connected disability benefit over time, instead of restricting it.  In 1955, the benefit read:

> **Accidental disability benefit.**  Upon application of a member, or of the head of his department, any member who has been totally and permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, through no negligence on his part, shall be retired by the board if the medical board certifies that such member is mentally or physically incapacitated for further performance of duty, that such incapacity is likely to be permanent, and that such member shall be retired.

RLH § 6-46 (1955).  By 1963, the statute was amended to provide both a "service-connected total disability benefit" and a "service-connected occupational disability benefit."  RLH §§ 6-46, 6-46.1 (Supp. 1963); see discussion supra.  In 1965, the legislature added that "any member who has been . . . incapacitated . . . as the cumulative result of some occupational hazard, through no wilful negligence on his part" may also be retired for service-connected disability.  See RLH §§ 6-46, 6-46.1 (Supp. 1965).  In 1974, the legislature "create[d] a presumption for retirement purposes that a fire[fighter] or sewer worker who is disabled . . . due to any disease of the heart, lungs or respiratory system is presumed to have been injured [or] diseased . . . while in the performance of [the employee's] duty and to grant disability retirement . . . benefits."  S. Stand. Comm. Rep. No. 919, in 1974 Senate Journal, at 1114; see 1974 Haw. Sess. Laws Act 182, at 391–95.

30

In 1987, police officers were added to the list.  See 1987 Haw. Sess. Laws Act 81, § 81 at 137–38.

The expansion of benefits provided under HRS § 88-79 over the years has been concurrent with the absence of statutory language limiting benefits to accidents occurring only in ERS-membership positions.  Indeed, throughout the consideration of the aforementioned amendments, the definitions of "membership service" and "service" remained unaltered.[12]  As recently as in 2002, the legislature reconsidered the entire text of HRS § 88-79 and did not alter the use of the term "service-connected," redefine it, or insert other terms.  See 2002 Haw. Sess. Laws Act 128, § 6, at 353–54.  Thus, that HRS § 88-79 uses the term "service-connected disability retirement" instead of "membership service-connected disability retirement" appears purposeful. All considered, this demonstrates that a restrictive interpretation of HRS § 88-79 in the manner suggested by the State and the Dissent would be contrary to the legislature's manifest purpose.

---

[12]  See 1969 Haw. Sess. Laws Act 110, § 1, at 94, 99 (amending and recodifying Parts I and II of Chapter 6, Revised Laws of Hawai'i 1955) (defining "membership service" as "all service rendered by a member for which he had made the required contributions to the system") (defining "service" as, in part, "service as an employee paid by the State or county").

C.      **Stout's Inability to Contribute to the ERS as a Summer School Teacher Does Not Detract from Her Performance of Service to the State While a Summer School Teacher or Alter Her Status as an ERS Member**

Despite the plain language of HRS § 88-79 and the foregoing legislative history analysis, the Dissent nevertheless asserts that there is an <u>additional</u> requirement that "logically follows" from HRS §§ 88-42.5 and 88-43: that the disabling accident occur only while the employee-member is working in the position that provides the employee's ERS membership eligibility. According to the Dissent, "[t]he fact that Stout was employed by the State for the summer session while contributing to ERS for another State job at the time of her injury is merely coincidental and should not be a factor when considering whether Stout was eligible for benefits."

We respectfully disagree with the Dissent. At the outset, we note that contrary to the Dissent's assertion that "Stout did not make any contributions to the ERS while in this position," Stout did in fact make contributions to the ERS year-round through deductions from her academic year salary, which was paid by the DOE over the course of twelve months. Although HRS § 88-42.5 concerns the limitation of an employee's ERS contributions (and therefore calculated distributions on retirement) and HRS § 88-43 concerns the denial of membership eligibility to part-time employees, they do not address the distribution of ERS benefits

32

to already existing members, such as Stout, or modify the definition of "service-connected." Thus, these statutes do not support the Dissent.

To illustrate, if HRS § 88-79 benefits were limited to "membership service-connected" injuries as interpreted by the Dissent, ERS members with two full-time State or county jobs, required to choose one full-time position pursuant to HRS § 88-42.5, would not be entitled to service-connected disability retirement for accidental injuries suffered during the non-membership position. The Dissent agrees with this hypothetical's conclusion, noting, "however harsh it appears on paper and in practice, this is the rule that is provided for under the law."

We do not agree that the legislature intended such a result. Simply because one full-time position is not the basis for ERS membership does not detract from the fact that the member continues to serve the State or county in that position. In other words, nothing in HRS § 88-42.5 or its legislative history shows that the legislature intended the statute to re-characterize the un-selected position from "service" to "non-service," or to create the harsh results suggested by the Dissent as legislatively intended. Rather, the sole express purpose of HRS § 88-42.5 was to limit the calculated amount of

33

an employee's ERS contributions and benefits to that based on the chosen position's pay.[13]

As noted above, the language of HRS § 88-79 and its legislative history do not support the Dissent's interpretation of HRS § 88-79. The following two reasons also support Stout's eligibility for benefits.

First, the definition of "service" in HRS § 88-21, quoted above, includes service during a paid leave of absence as well as service during an unpaid leave of absence, as long as the employee is a member who is engaged in the performance of a governmental function or professional improvement, and as long as the employee continues making contributions to the ERS system. Stout was making such contributions on June 30, 1988. Teaching public summer school would be the performance of a governmental function or approved professional improvement. Thus, even if "service," as that term is used in HRS § 88-79, were limited to Stout's service as a full-time public school teacher, she remains eligible for HRS § 88-79 benefits.

Second, the hearing officer expressed the concern reiterated by the ERS Board at oral argument in the circuit court, that "it would be unfair to all other members of the ERS to have retirement benefits taken by Applicant out of ERS funds

---

[13] See supra n.9 (quoting HRS § 88-42.5).

when neither the DOE nor Applicant made the requisite contributions for such retirement benefits from her part-time temporary summer school earnings."  However, as is evident by other sections within HRS Chapter 88, as explained above, the legislature's primary concern with respect to the issuance of benefits under HRS § 88-79 appears to be service to the State or county, and not additional contributions to the ERS, as long as the member is making ERS contributions during the time of the additional government service.  Thus, the Dissent's suggestion that our holding would mean that "a large class of people – all those who work at public summer school across the State, including teachers, administrators, and various support staff – to receive benefits without paying into the retirement system," is an unfounded alarm, as it wholly disregards that only existing ERS members would be eligible for service-connected disability benefits.  The Dissent's assertion that our holding "creates a tremendous financial burden and unfunded liability for the ERS because the ERS is now responsible for paying benefits to an unknown number of employees who become injured on the job but who have not contributed into the system," is also without merit for this reason.  In addition, there is no evidentiary support in the record for the Dissent's sweeping assertions, including the suggestion that our holding will have negative far-reaching effects and consequences.

Also, HRS § 88-132 (Supp. 2011) provides that the State or county pay all contributions to the ERS when members must leave active service of the State or any county for military service in times of war or national or state emergencies. Yet, despite such continuing contributions to the ERS, the member is not entitled to benefits under HRS § 88-79 if "incapacitated for duty by accident, act of war, or otherwise, occurring while the member is not in the service of the State or any county." HRS § 88-136 (Supp. 2004). Thus, the legislature's framework for "fairness" as to who is entitled to benefits under HRS § 88-79 is not based on the amount of money contributed by or on behalf of a member, but rather if the disabling accident occurs while in service to the State or county, as long as ERS contributions are being made during the non-membership service.

In sum, HRS Chapter 88 provides for a retirement benefit to members who become disabled due to the occurrence of an accident while in the service of the State or any county, regardless if that service is "membership service." For the foregoing reasons, even if Stout's service as a summer school teacher to the DOE at the time of the shooting may not have been "membership service," she is eligible for benefits under HRS § 88-79.

Based on our analysis, we need not and do not address Stout's additional points on appeal, including whether or not

36

Hawaii's pension and retirement benefits law, i.e., Chapter 88, should be "liberally construed" in favor of beneficiaries.[14]

For all of these reasons, again, we respectfully disagree with the Dissent. The Dissent's reliance on HRS §§ 88-42.5 and 88-43 is misplaced because, as discussed, although these statutes permit the ERS board to limit membership and contributions, they do not restrict the benefits of existing members, such as Stout. Moreover, what the Territorial Legislature noted in 1925 when it created the ERS remains true today: <u>regardless</u> of an employee's age or length of service, should the employee become disabled as a result of a service-connected accident, he or she is eligible for accidental or service-connected disability retirement benefits. <u>See</u> HRS §§ 88-79, 88-80 (imposing no age or length or service requirement for the receipt of an allowance on retirement for service-connected disability); <u>1925 Joint Report</u> 27 (same); <u>id.</u> at 8 ("The government will provide the total pension payable in the case of accidental death or accidental disability of the employee."); <u>see also</u>, <u>e.g.</u>, Emps.' Ret. Sys., <u>Questions & Answers About Your Employees' Retirement System Contributory</u>

---

[14] Several states, including Mississippi, have interpreted their government workers' pension laws in a manner so as "to carry out, and properly recognize, their beneficent policy and purpose, and to confer the benefits intended." <u>Smith v. Bd. of Gen. Ret. Sys. of Meridian</u>, 224 Miss. 13, 23, 79 So. 2d 447, 451 (Miss. 1955).

Plan 5 (2012) ("Regardless of credited service, if you are permanently disabled as a result of a job-related (service-connected) accident, you are entitled to a 100% refund of your contributions (including interest) and a pension of 35% of your AFC for life." (emphasis added)). Clearly, so long as an employee is a current ERS member, the amount of the member's contributions is irrelevant to the employee's receipt of a service-connected disability benefit.

The Dissent acknowledges the plain language of HRS § 88-79 "might suggest" the Majority's conclusion, yet the Dissent nevertheless suggests the Majority arrived at its decision out of pity. In actuality, the rule of law controls. This is made clear by the plain text of HRS § 88-79 within the context of the entirety of chapter 88 and its legislative history, demonstrating a long-standing legislative goal to provide for governmental employees who become disabled in connection with their State or county governmental service as long as ERS contributions were being made during the non-membership service.

## V. Conclusion

For the foregoing reasons, we vacate the ERS Board's October 27, 2014 Final Decision and the circuit court's July 28, 2015 "Final Judgment and Decision and Order Affirming the Final Decision of Appellee Board of Trustees of the Employees' Retirement System of the State of Hawaii and Dismissing

38

Appellant Rosemary H. Stout's Appeal."  This matter is remanded to the ERS Board for further proceedings consistent with this opinion.[15]

| | |
|---|---|
| John C. McLaren<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Brian Aburano<br>for respondent | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

[15]  The court observes that the Board had previously acknowledged that it would "approve and accept the certifications, findings and recommendations contained in the [Medical Board's] Report," except for the Medical Board's "finding that [Stout's] disability is the 'result of an accident occurring while in the 'actual performance of duty.'[']"